United States District Court
Southern District of Texas
**ENTERED**
January 24, 2023
Nathan Ochsner, Clerk

# In the United States District Court for the Southern District of Texas

## GALVESTON DIVISION

### No. 3:20-cv-12

IN THE MATTER OF THE COMPLAINT OF
ODFJELL CHEMICAL TANKERS AS, GOLDEX FORTUNE, LTD., ODJFELL
MANAGEMENT AS, AND ODFJELL TANKERS AS, AS OWNERS AND
OPERATORS OF THE *M/T BOW FORTUNE*

*CONSOLIDATED WITH*

### No. 3:20-cv-16

IN RE MASTER JIMBO, INC., AS OWNER AND/OR OWNER *PRO HAC VICE* OF
THE *F/V PAPPY'S PRIDE* PRAYING FOR EXONERATION
FROM OR LIMITATION OF LIABILITY

## MEMORANDUM OPINION AND ORDER ENTERING FINDINGS OF FACT AND CONCLUSIONS OF LAW

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

This maritime action arises from a collision in Galveston Bay on January 14, 2020. A small commercial-fishing vessel, the *Pappy's Pride*, and a tanker, the *Bow Fortune*, collided, causing the *Pappy's Pride* to capsize,

three of her crew members to drown, and a fourth crew member to suffer serious personal injury.

The petitioners for the *Bow Fortune* and the *Pappy's Pride* separately filed two complaints in limitation. Both petitions seek exoneration from, or limitation of liability for, the collision. *See* 46 U.S.C. §§ 30505, 30511. The court consolidated the petitions. *See* Dkt. 99.

In a two-day bench trial, the court addressed the limitation proceedings and allocated fault between the parties. Based on the evidence adduced at trial, the parties' arguments, and the relevant law, the court finds and concludes as follows:

- The *Bow Fortune* petitioners proved by a preponderance of the evidence that the *Pappy's Pride* did not (i) maintain a proper lookout, (ii) use all available means to determine if a collision risk existed, (iii) take action to avoid a collision, (iv) properly cross a narrow channel, (v) appropriately alter her course in restricted visibility, or (vi) use a fog signal in or near an area of restricted visibility, in violation of Inland Navigation Rules 5, 7, 8, 9, 19, and 35. The *Bow Fortune* petitioners also proved by a preponderance of the evidence that Master Jimbo, Inc., did not train the *Pappy's Pride* crew on the Inland Navigation Rules before the collision.

- The *Bow Fortune* petitioners proved by a preponderance of the evidence that the *Pappy's Pride* did not respond to radio calls from the *Bow Fortune* before the collision and only had one functioning radio, in violation of U.S. Coast Guard requirements, 33 C.F.R. § 26.0346, and 46 C.F.R. § 28.245.

- Because the Pappy's Pride violated statutory rules intended to prevent collisions, the *Pennsylvania* rule's presumption applies against her.

- The *Pappy's Pride* failed to prove by a preponderance of the evidence that she could not have been the legal cause of the collision. The collision was solely and proximately caused by the unseaworthiness of the *Pappy's Pride* and the negligent acts and omissions of Master Jimbo's employees.

- The *Pappy's Pride*'s unseaworthiness and her crew's negligence were within Master Jimbo's privity.

- Master Jimbo is not entitled to limit its liability under 46 U.S.C. § 30505.

- The *Pappy's Pride* failed to prove by a preponderance of the evidence that the *Bow Fortune* did not (i) maintain a proper lookout, (ii) maintain a safe speed, (iii) use all available means to determine if a collision risk existed, (iv) take action to avoid a collision, or (v) alter her course in restricted visibility, in violation of Inland Navigation Rules 5, 6, 7, 8, and 19, or that the *Bow Fortune* was otherwise negligent or unseaworthy.

- The *Pappy's Pride* failed to prove by a preponderance of the evidence that the *Bow Fortune* was a legal cause of the collision.

- The *Bow Fortune* petitioners have no liability for the collision and are entitled to exoneration from liability under 46 U.S.C. § 30505.

The reasons for these rulings are set out below. Any findings of fact that are also, or only, conclusions of law are so deemed, and any conclusions of law that are also, or only, findings of fact are likewise so deemed.

## I.   Background

### A. The Parties

The two petitioners in this lawsuit are the owners of the *Bow Fortune* and the owner of the *Pappy's Pride*.

The *Bow Fortune* petitioners are Odfjell Chemical Tankers AS, Goldex Fortune Ltd., Odfjell Management AS, and Odfjell Tankers AS. They are all foreign entities. The *Bow Fortune* petitioners own and operate the *Bow Fortune*, a Norwegian-flagged steel-hulled chemical and oil-product tanker. She carries 28 crewmembers, is approximately 601 feet long, and is about 106 feet on her beam. Captain Ronald Olsen commanded the *Bow Fortune*.



*The Bow Fortune*

Master Jimbo, Inc., is the petitioner for the *Pappy's Pride*. Master Jimbo is incorporated in Texas, with its corporate headquarters in Alvin, Texas. Master Jimbo regularly engages in business in Texas and Texas

waters. Charlotte Ann Ryan owns the company and serves as president. Her son, Captain Daryl Ryan (hereinafter "Ryan"), manages its day-to-day operations. Master Jimbo owns the *Pappy's Pride*, a United States-flagged steel-hulled commercial-fishing vessel. She is 81 feet long and 24 feet on her beam. Captain Raymond Herrera commanded the *Pappy's Pride* when the accident occurred.



*The Pappy's Pride*

### B. Jurisdiction and Venue

This court has jurisdiction over this dispute under 28 U.S.C. § 1333, Federal Rule of Civil Procedure 9(h), and Supplemental Admiralty Rules C and F. Venue is proper in the Southern District of Texas because the *Bow Fortune* petitioners and Master Jimbo availed themselves of this district by directing their vessels into the waters of Galveston Bay, which is in this judicial district.

### C. Master Jimbo's Failure to Train the *Pappy's Pride*'s Crew

The Inland Navigation Rules, codified in 33 C.F.R. § 83.01, *et seq.*, provide the "rules of the road" for vessels navigating the inland waters of the United States, including the Galveston Bay Entrance Channel. The general purpose of these rules is to prevent waterway incidents such as the collision at the heart of this case.

Herrera began captaining the *Pappy's Pride* in 2013. He did not hold an unlimited master-mariner license, nor was he required to by statute to pilot a vessel like the *Pappy's Pride*. But as the *Pappy's Pride*'s captain, he was obligated to know and follow the Inland Navigation Rules. Master Jimbo did not provide any *Pappy's Pride* crewmembers with formal training or inquire into what training they may have otherwise received on the Inland Navigation Rules.

### D. The *Pappy's Pride*'s Radio

Master Jimbo outfitted the *Pappy's Pride* with various systems, including an autopilot system, three very-high-frequency (VHF) radios, and four antennae. The *Pappy's Pride* also had an automatic identification system (AIS), which allowed her operator to monitor other vessels' movements to avoid collisions. The ship used three antennae to transmit VHF signals and another antenna for AIS information.

In early January 2020, Ryan learned that the *Pappy's Pride*'s autopilot system and communications equipment were malfunctioning. He arranged for technicians from Trionics, LLC, to assess the equipment. On January 6, 2020, two Trionics electronics technicians evaluated the VHF radios and autopilot system. Though the technicians found no issues with the autopilot, they found that only two of three VHF radios were appropriately broadcasting and only one of three VHF antennas was properly functioning. The technicians connected the remaining functioning antenna to one of the working VHF radios. From January 6, 2020, until the day of the collision, the *Pappy's Pride* had only one operational VHF radio.

After the inspection, Trionics provided Ryan an estimate of the cost to repair or replace the faulty VHF radio and antennae. Trionics supposed it could acquire the necessary parts and complete the repairs within four days.

Ryan decided against the repair and did not personally check the radios after the Trionics inspection, though he acknowledged that it would be dangerous for the *Pappy's Pride* to sail with only one working VHF radio. The parties present no evidence that Master Jimbo repaired the VHF radios by other means.

### E. The Collision

The *Pappy's Pride* and *Bow Fortune* collided on January 14, 2020. The evening before the collision, the Galveston, Texas City, and Houston pilots closed Galveston Bay's inbound and outbound deep-draft (oceangoing) traffic. They did so because fog had reduced visibility throughout the bay. The fog remained in the bay on January 14.

### 1.    *Pappy's Pride*'s Conduct Before the Collision

With only one functioning VHF radio, Captain Herrera steered the *Pappy's Pride* away from the Ryan Marine Services' facility on January 14, between 1:00 and 1:30 p.m. Three other crewmembers were also on board: Jose Montenegro, Constantino Corona, and Steven Edison.

At 2:17 p.m., the *Pappy's Pride* entered the Intracoastal Waterway, heading eastbound toward the Houston Ship Channel along the northern edge of Pelican Island. By 3:08 p.m., she had crossed the Texas City and Houston Ship Channels and entered the Bolivar Roads Anchorage areas north of the Galveston Bay Entrance Channel.



*Entrance to Galveston Bay*

It was when the *Pappy's Pride* entered the anchorage area that she first encountered foggy conditions. The *Pappy's Pride* did not sound fog signals or post a lookout as she moved through the fog.

### 2.  *Bow Fortune*'s Conduct Before the Collision

That same morning, the *Bow Fortune* was anchored about 15 miles offshore in the East Galveston Fairway Anchorage Area. When the pilots reopened Galveston Bay on January 14, the *Bow Fortune* started maneuvering from the anchorage area to the pilot-boarding area. The *Bow Fortune* was equipped with a functioning voyage data recorder (VDR) and a

personal pilot unit (a system that allows a captain to see the speed and course of surrounding vessels).

The *Bow Fortune* was in ballast (not carrying any cargo) and heading inbound. Her crew intended to lay berth in Galveston Harbor to offload a portable generator. Her passage plan noted that "[m]ariners should be alert to the possibility of strong crosscurrents as they transit the Galveston Bay Entrance Channel" around buoys 7/8.

At 3:00 p.m., Pilot Clinton Schuessler boarded the *Bow Fortune*, and the customary master-pilot exchange took place. The pilot card listed the vessel's maneuvering equipment, load, and overall conditions. It also noted the *Bow Fortune*'s maneuvering speeds in ballast conditions: full ahead was 13 knots, half ahead was 11 knots, slow was 7 knots, and dead slow was 5 knots. Schuessler then took the conn of the *Bow Fortune* for inbound transit.

At about 3:06 p.m., the *Bow Fortune* began sounding her fog signal. Schuessler estimated he could see "a little less than two-tenths of a mile" ahead of him. Although he could see the bow clearly, Schuessler asked for a crewmember to serve as a lookout at the vessel's bow. The lookout would turn away from the bow with each blast of the vessel's foghorn to protect his hearing.

The *Bow Fortune* proceeded at full ahead, traveling 14.7 knots through the water. Due to the current, however, the vessel moved only 13.2 knots over the ground. Between 3:17 and 3:27 p.m., the *Bow Fortune* safely passed three outbound vessels—the *M/T Torm Republican*, *M/V Maersk Ohio*, and *M/T Minerva Karteria*—without incident. She remained on course to enter the Galveston Bay Entrance Channel.

### 3.   The Vessels' Collision

The parties do not dispute the vessels' trajectories leading up to the collision. At about 3:30 p.m., the *Pappy's Pride* was headed outbound through the Bolivar Roads Anchorage Area toward the northern Galveston Bay Entrance Channel. Meanwhile, the *Bow Fortune* continued full ahead within the Galveston Bay Entrance Channel, approaching the Galveston jetties. Schuessler testified that in his experience, it is customary to travel full ahead in the Galveston Bay Entrance Channel before approaching the jetties because there is usually a crosscurrent near the end of a jetty.

At about 3:32 p.m., the *Pappy's Pride* gradually turned south-southeast toward the Galveston Bay Entrance Channel—and toward the *Bow Fortune*. Two minutes later, the *Bow Fortune* was approaching and passing buoys 7/8 and preparing to meet an outbound tanker, the *Chemical Atlantik*.

Meanwhile, the *Pappy's Pride* was about 0.9 nautical miles ahead of the *Bow Fortune*—and heading toward it.

Concerned, Schuessler reacted. At 3:35:18 p.m., he called the *Pappy's Pride* on the radio for the first time: "Calling the Pappy's Pride, Pappy's Pride, Pappy's Pride." Schuessler initiated a slight turn to port to continue moving within the channel but also avoid the *Pappy's Pride*. He also continued traveling full ahead, noting several reasons not to slow down: maintaining the *Bow Fortune*'s position in the channel, meeting other large vessels, combating potential crosscurrents near the jetties, and avoiding two inbound ships behind him.

The *Pappy's Pride* did not respond to Schuessler's first call. At 3:35:30 p.m., Schuessler called again: "Pappy's Pride, Pappy's Pride." Eight seconds later, when the *Pappy's Pride* was about 0.65 nautical miles ahead, Schuessler ordered the first speed reduction to half ahead. He also contacted the *Nordic Anne* and *Chemical Atlantik*, two nearby vessels, regarding the *Pappy's Pride*.

The *Pappy's Pride* remained unresponsive. At 3:36:17 p.m., she gradually approached the *Bow Fortune* and was about 0.5 nautical miles ahead. With increasing concern, Schuessler ordered the danger signal, and the *Bow Fortune* blasted her horn in five short, rapid blasts. Nine seconds

later, and again with no response, Schuessler ordered the second speed reduction to slow ahead, and the *Bow Fortune* slowed to 12.5 knots.

At 3:36:44 p.m., Schuessler called a third time: "Pappy's Pride, Pappy's Pride, Pappy's Pride." He also ordered the *Bow Fortune* to turn starboard, first by ten and then by twenty degrees. The *Bow Fortune* turned to starboard, navigating outside the channel and attempting to skirt past the *Pappy's Pride* at the channel's edge.

With the *Pappy's Pride* still unresponsive and now just 0.125 nautical miles away, the *Bow Fortune* sounded a second danger signal at 3:36:59 p.m. The *Pappy's Pride* then crossed in front of the *Bow Fortune*, moving to just off her port bow. At that point, Schuessler believed the vessels would safely pass each other. The *Bow Fortune*'s speed slowed to 11.8 knots.

But at 3:37:27 p.m., midway between buoys 8 and 10 on the channel's northern edge, the *Pappy's Pride* unexpectedly turned sharply toward port. Three seconds later, the *Pappy's Pride*'s starboard side collided with the *Bow Fortune*'s port bow, and the *Pappy's Pride* capsized. The *Bow Fortune* called for assistance. Tragically, three *Pappy's Pride* crewmembers died in the collision. The fourth suffered severe injuries.

Master Jimbo does not dispute that in the last two minutes and nine seconds before the vessels collided, the *Pappy's Pride* (1) did not have a

dedicated lookout, (2) did not sound a fog signal or danger signal, and (3) did not respond to three radio hails and two danger signals.

## II. Legal Standard

Under the Limitation of Liability Act, "the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight." 46 U.S.C. § 30505(a). Claims subject to limitation include "any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture done, occasioned, or incurred, without privity or knowledge of the owner." *Id.* § 30505(b). As the owners of the vessels that collided, the *Bow Fortune* petitioners and Master Jimbo both seek exoneration and limited liability under the Act. *See id.* § 30511(a).

Courts employ a two-step process to determine whether a shipowner is entitled to exoneration or limited liability. *Cont'l Ins. Co. v. L&L Marine Transp. Inc.*, No. 14-2967, 2017 WL 4844272, at *3 (E.D. La. Oct. 26, 2017) (quoting *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976)). Initially, the party seeking exoneration or limited liability "must establish that the vessel was negligent or unseaworthy" and that "those acts caused the accident." *Cont'l Ins. Co.*, 2017 WL 4844272, at *2 (citing *In re Kristie Leigh Enters., Inc.*, 72 F.3d 479, 481 (5th Cir. 1996)). Then, "the burden shifts to

the owner of the vessel to prove that negligence [or unseaworthiness] was not within the owner's privity or knowledge." *In re Hellenic Inc.*, 252 F.3d 391, 395 (5th Cir. 2001).

To establish a negligence claim under admiralty law, claimants must show (1) the defendant owed the claimant a duty; (2) the defendant breached that duty; and (3) the breach caused the claimant's alleged damages. *In re Mid-S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005). "Under maritime law, a plaintiff is owed a duty of care under the circumstances." *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010). "[A] party's negligence is actionable only if it is a 'legal cause' of the plaintiff's injuries." *Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 649 (5th Cir. 1992). Legal cause is a higher standard than "but for" causation: legal cause requires that the defendant's negligence is the proximate cause and a "substantial factor" in the injury. *See Rose Crewboat Servs., Inc. v. Wood Res., LLC*, 425 F. Supp. 3d 668, 676 (E.D. La. 2019); *Great Am. Ins. Co. v. Pride*, 847 F. Supp. 2d 191, 204 (D. Me. 2012).

Courts derive the duty of care from "traditional concepts of prudent seamanship and reasonable care, statutory and regulatory rules, and recognized customs and uses." *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 364 (5th Cir. 2006). In maritime cases, liability

analysis begins with reviewing the applicable statutes or regulations. *Id.* (citing *Folkstone Maritime, Ltd. v. CSX Corp.*, 64 F.3d 1037, 1046 (7th Cir. 1995)).

Seaworthiness is defined as "reasonable fitness to perform or do the work at hand." *Farrell Lines, Inc.*, 530 F.2d at 10 n.2. As both the seaworthiness and negligence analyses rely on the reasonableness standard, a negligence finding will overlap with an unseaworthiness finding. *Id.* Proper equipment, such as functioning radios, and training are indicators of seaworthiness. *See id.* at 12; *Trico Marine Assets Inc. v. Diamond B Marine Servs. Inc.*, 332 F.3d 779, 790 (5th Cir. 2003). "When unseaworthiness exists due to equipment that is defective at the start of a voyage, and the defects can be discovered through the exercise of reasonable diligence, limitation of liability is less likely to be available." *In re Omega Protein, Inc.*, 548 F.3d 361, 372 (5th Cir. 2008).

Over the years, admiralty courts have developed certain presumptions and burden-shifting principles. *Archer Daniels Midland, Co. v. M/T Am. Liberty*, 545 F. Supp. 3d 390, 403 (E.D. La. 2021). The *Pennsylvania* rule is one example: it is a "burden-shifting presumption for causation when a vessel 'at the time of a collision is in actual violation of a statutory rule intended to prevent collisions.'" *Mike Hooks Dredging Co. v. Marquette*

*Transp. Gulf-Inland, L.L.C.*, 716 F.3d 886, 891 (5th Cir. 2013) (quoting *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136 (1873)).

Under the *Pennsylvania* rule, a ship that violates a statute or regulation designed to prevent collisions is "liable unless [she] can prove that [her] violation 'could not have been a cause of the collision.'" *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co.*, 974 F.3d 601, 605 n.2 (5th Cir. 2020) (quoting *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991)). The offending ship bears the burden to show "not merely" that she "probably" did not cause or "might not have caused" the collision; instead, she must show her fault "could *not*" have caused the collision. *Mike Hooks Dredging Co.*, 716 F.3d at 891 (emphasis added). "The [*Pennsylvania*] rule thus creates a presumption that one who violates a regulation intended to prevent collisions will be deemed responsible." *Tokio Marine & Fire Ins. Co. v. Flora MV*, 235 F.3d 963, 966 (5th Cir. 2001). The rule's presumption, however, is rebuttable and "applies only to violations of statutes that delineate a clear legal duty." *Id.*

If claimants succeed in establishing negligence or unseaworthiness, the burden then shifts to the limitation petitioner to demonstrate a lack of privity or knowledge. *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991). "[A] shipowner has privity if it personally participated in the negligent conduct or

brought about the unseaworthy condition." *Trico Marine Assets Inc.*, 332 F.3d at 789 (citing *Pennzoil*, 943 F.2d at 1473). "Knowledge, when the shipowner is a corporation, is judged not only by what the corporation's managing officers actually knew, but also by what they should have known with respect to conditions or actions likely to cause the loss." *Pennzoil*, 943 F.2d at 1473–74.

This consolidated case involves two limitation proceedings. The court addresses each in turn.

## III.  Findings and Conclusions as to Master Jimbo's Limitation Claim

### A.    Negligence and Seaworthiness

Based on the evidence submitted at trial, the court finds that the *Pappy's Pride* was negligent and unseaworthy. Her violations of Inland Navigation Rules 5 (Look-out), 7 (Risk of Collision), 8 (Action to Avoid Collision), 9 (Narrow Channels), 19 (Conduct of Vessels in Restricted Visibility), and 35 (Sound Signals in Restricted Visibility), as well as her failure to follow applicable radio regulations and her owner's failure to train Captain Herrera, legally caused her collision with the *Bow Fortune*.

The Inland Navigation Rules govern the conduct of vessels navigating in the Outer Bar Channel section of the Galveston Bay Entrance Channel— where the collision occurred. *See* 33 C.F.R. §§ 83.01(a), 83.03(q). Rule 5—

Lookout—requires vessels to "at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions . . . to make a full appraisal of the situation and of the risk of the collision." *Id.* § 83.05. The evidence shows that the *Pappy's Pride* did not post a lookout on January 14, 2020. Captain Kevin Highfield, Master Jimbo's retained expert witness, conceded that the *Pappy's Pride* had not posted a lookout before the collision occurred. Dkt. 160 at 57. The court also finds that the *Pappy's Pride* failed to have a virtual lookout by monitoring her VHF and AIS systems. It is undisputed that the *Pappy's Pride* did not respond to three radio hails from Schuessler on the VHF radio or the two danger signals from the *Bow Fortune*'s foghorn. As credibly noted by Captain Marc Fazioli, the *Bow Fortune*'s expert witness, this collision would very likely not have occurred if the *Pappy's Pride* had maintained a proper lookout. Dkt. 161 at 348–50. The *Pappy's Pride*'s failure to post a proper lookout violated Rule 5.

Rule 7—Risk of Collision—requires every vessel to "use all available means appropriate to the prevailing circumstances and conditions to determine if [a] risk of collision exists." 33 C.F.R. § 83.07(a). It also requires vessels to properly use radio equipment if "fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar

plotting or equivalent systematic observation of detected objects." *Id.* § 83.07(b). The court finds that the *Pappy's Pride* failed to use all available means appropriate to her circumstances to determine if a collision risk existed. From the evidence presented at trial, the court finds that the *Pappy's Pride* did not use her radio and radar equipment to determine if a collision risk existed. Accordingly, the *Pappy's Pride* violated Rule 7.

Rule 8—Action to Avoid Collision—generally requires that vessels avoid activities that may cause close-quarters encounters without providing ample time for another vessel to avoid a collision. *See id.* § 83.08. The court finds that the *Pappy's Pride* violated Rule 8 in two ways. First, the *Pappy's Pride* altered her course toward the Galveston Bay Entrance Channel edge and impeded the *Bow Fortune*'s path. Second, the *Pappy's Pride*'s startling turn to port once near the *Bow Fortune* plainly violated Rule 8 because it made it exceedingly difficult for the vessels to avoid a collision. The *Pappy's Pride*'s course alteration and last-second turn violated Rule 8 and caused the collision.

For the same reason, the court finds that the *Pappy's Pride* violated Rules 9 and 19. Rule 9—Narrow Channels—prohibits vessels from crossing a narrow channel if the crossing impedes another vessel's passage. *See id.* § 83.09(d). Rule 19—Conduct of Vessels in Restricted Visibility—requires

vessels to avoid altering their course to port in restricted visibility settings. *See id.* §§ 83.19(a), (d)(i), (e). The *Pappy's Pride* violated Rules 9 and 19 when it crossed the channel in front of the *Bow Fortune* and suddenly turned to port.

Rule 35—Sound Signals in Restricted Visibility—requires vessels to use a fog signal in or near an area of restricted visibility. *Id.* § 83.35. It is undisputed that the *Pappy's Pride* did not sound her fog signal on January 14. Both Highfield and Ryan testified that the *Pappy's Pride* did not use a fog signal before the collision and as she traveled in restricted-visibility conditions. Dkt. 160 at 88–89, 122–23. Accordingly, the *Pappy's Pride* violated Rule 35.

The court further finds that the *Pappy's Pride* violated U.S. Coast Guard requirements and certain federal regulations by repeatedly failing to respond when hailed. *See* BF Ex. 96 at 7 (requiring vessels like the *Pappy's Pride* to "monitor the designated VTS VHF-FM frequency for the area in which [they] are operating, respond if hailed, and comply with general VTS operating rules"); 33 C.F.R. § 26.0346 (mandating vessels like the *Pappy's Pride* to have two VHF radios); 46 C.F.R. § 28.245 (same). Again, neither party disputes that the *Pappy's Pride* did not respond to the *Bow Fortune's* VHF messages when hailed. The court further finds that the *Pappy's Pride*

had a functioning VHF radio. These violations, more likely than not, contributed to the cause of the collision.

The evidence submitted at trial also shows that Master Jimbo failed to train the *Pappy's Pride* crew on the Inland Navigation Rules. The court is particularly troubled that Edison, the surviving deckhand, testified that he could not tell what a danger signal sounds like, nor could he differentiate between a fog signal and a danger signal. MJ Ex. 19, 55:1–8, 57:18–20.

Although Master Jimbo does not contest that it did not formally train the crew on the Inland Navigation Rules, it argues that each crewmember was experienced in working on shrimping vessels. Master Jimbo further contends that there is "no direct evidence that lack of training caused or contributed to the collision." Dkt. 167 at 9. But the court disagrees and finds it more likely than not that had Master Jimbo ensured that the *Pappy's Pride*'s crew had been trained on the Inland Navigation Rules, they would have understood and reacted to the *Bow Fortune*'s danger and fog signals.

Because *the Pappy's Pride* violated numerous regulations, the court holds that the *Pennsylvania* rule's presumption of liability applies to her. But even in the absence of the *Pennsylvania* rule's presumption, the actions and inactions of the *Pappy's Pride*'s crew constituted a breach of her duty of care to the *Bow Fortune* and legally caused the collision.

## B. Privity and Knowledge

A party may limit its liability "only if it is 'without privity or knowledge' of the cause of the loss." *Pennzoil*, 943 F.2d at 1473 (quoting 46 U.S.C. § 183(a)). "[A] shipowner has privity if he personally participated in the negligent conduct or brought about the unseaworthy condition." *Id.*

Master Jimbo argues that it lacked privity or knowledge. It alleges the *Pappy's Pride* was competently equipped, manned, crewed, and seaworthy. It also claims the collision was a tragic accident unrelated to the *Pappy's Pride*'s unseaworthiness or Master Jimbo's negligence.

The court disagrees. Master Jimbo had privity of the unseaworthy conditions that caused the collision. *See Archer Daniels*, 545 F. Supp. 3d at 408 (quoting *Bowmech Marine, Inc. v. United Gas Pipeline Co.*, Nos. 91-2409 & 91-1893, 1992 WL 266098, at *3 (E.D. La. Sept. 24, 1992) (quotations omitted) ("With respect to the competency of a vessel's crew, privity will exist if the owner fails to train the crew or fails to make appropriate inquiries as to the crew's competence."). Ryan testified that Master Jimbo never trained the *Pappy's Pride* crew on the Inland Navigation Rules or other collision regulations. Dkt. 160 at 114–15. Edison further testified that Master Jimbo did not offer formal training on the rules or inquire into the crew's competency.

Master Jimbo was negligent and the *Pappy's Pride* was unseaworthy. Their negligence and unseaworthiness directly caused this accident. Moreover, Master Jimbo did not meet its burden to show that it lacked privity and knowledge of the conditions that caused the collision. Accordingly, Master Jimbo is not entitled to limit its liability under 46 U.S.C. § 30505.

## IV. Findings and Conclusions as to the *Bow Fortune* Petitioners' Limitation Claim

Master Jimbo raised four theories of liability against the *Bow Fortune*: (1) failure to maintain a proper lookout under Rule 5; (2) failure to proceed at a safe speed in restricted visibility under Rules 6 and 19; (3) failure to avoid a risk of collision in a narrow channel under Rule 7; and (4) failure to act and avoid collision under Rule 8. The court holds that the *Bow Fortune*'s actions neither breached her duty of care to the *Pappy's Pride* nor violated any of the above-referenced rules. Further, the *Bow Fortune*'s conduct was not a "substantial contributing cause" of the collision. Thus, the *Bow Fortune* was not negligent.

Master Jimbo argues that the *Bow Fortune* violated Rule 5—the lookout rule. Master Jimbo does not dispute that the *Bow Fortune* had a lookout on her bow. *See* Dkt. 165 at 15. It claims, however, that the lookout's

conduct—moving away from the bow periodically to protect his ears from the foghorn's blasts—"amount[s] to not having a lookout at all." *Id.*

The court rejects this argument. Vessels "must have constant and vigilant look-outs stationed in proper places on the vessel[] and charged with the duty for which look-outs are required." *Chamberlain v. Ward*, 62 U.S. 548, 570 (1858). Lookouts must be "persons of suitable experience, properly stationed on the vessel, and actually and vigilantly employed in the performance of the duty." *Id.* Courts have found lookouts' conduct insufficient to satisfy Rule 5 in some circumstances:

- Where a lookout's view was obstructed by lights, rigging, or the vessel's spar, *id.* at 571;

- Where the man assigned a bridgewatch did not know he was supposed to keep a lookout, *Cliffs-Neddrill Turnkey Int'l-Oranjestad v. M/T Rich Duke*, 947 F.2d 83, 89 (3d Cir. 1991);

- Where the lookout was stationed in a wheelhouse 12 feet from the bow and managing other responsibilities, *Mar. & Mercantile Int'l L.L.C. v. United States*, No. 02-CV-1446 (KMK), 2007 WL 690094, at *21 (S.D.N.Y. Feb. 28, 2007); and

- Where the lookout was allowed to leave the bridge for half an hour as a close-quarters situation was developing, *In re G&G Shipping Co.*, 767 F. Supp. 398, 408 (D.P.R. 1991).

None of those situations apply here. In addition to posting a lookout on the bow, the *Bow Fortune* also monitored the *Pappy's Pride* by radio and AIS. Although the lookout quickly turned away during the vessel's foghorn

blasts, that does not—at least under these circumstances—amount to a

breach of duty. The *Bow Fortune* did not violate Rule 5.

Next, Master Jimbo argues that the *Bow Fortune* violated Rules 6 and

19. Rule 6—Safe Speed—provides as follows:

> Every vessel shall at all times proceed at a safe speed so that she can
> take proper and effective action to avoid collision and be stopped
> within a distance appropriate to the prevailing circumstances and
> conditions. In determining a safe speed[,] the following factors shall be
> among those taken into account:
>
> (a) By all vessels:
>
> > i.   The state of visibility;
> >
> > ii.  The traffic density[,] including concentration of fishing
> >      vessels or any other vessels;
> >
> > iii. The maneuverability of the vessel with special reference to
> >      stopping distance and turning ability in the prevailing
> >      conditions;
> >
> > iv.  At night, the presence of background light such as from shore
> >      lights or from back scatter of her own lights;
> >
> > v.   The state of wind, sea, and current, and the proximity of
> >      navigational hazards; [and]
> >
> > vi.  The draft in relation to the available depth of water.
>
> (b) Additionally, by vessels with operational radar:
>
> > i.   The characteristics, efficiency[,] and limitations of the radar
> >      equipment;
> >
> > ii.  Any constraints imposed by the radar range scale in use;
> >
> > iii. The effect on radar detection of the sea state, weather, and
> >      other sources of interference;

    iv.    The possibility that small vessels, ice[,] and other floating objects may not be detected by radar at an adequate range;

    v.    The number, location, and movement of vessels detected by radar; [and]

    vi.    The more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.

33 C.F.R. § 83.06. Similarly, Rule 19—Conduct of Vessels in Restricted Visibility—mandates vessels "proceed at a safe speed adapted to the prevailing circumstances and conditions of restricted visibility." *Id.* § 83.19(b).

Master Jimbo alleges that the *Bow Fortune*'s speed—full ahead in foggy conditions—prevented her from slowing down to avoid the collision. But the speed at which vessels can safely travel "in fog depends on the circumstances of each case." *Trico Marine Assets Inc. v. Diamond B Marine Servs. Inc.*, 332 F.3d 779, 788 (5th Cir. 2003) (citing *The Pennsylvania*, 86 U.S. at 133). Schuessler credibly testified that he considered all the factors listed in Rule 6 when setting the speed of the *Bow Fortune* before the collision and that he believed his speed was safe under the circumstances. Schuessler further testified that he needed to maintain the *Bow Fortune*'s speed to preserve her position in the channel, combat potential crosscurrents, and avoid inbound ships—namely, the *Chemical Atlantik. See Stolt*, 447 F.3d at 366 ("It was not error for the district court to apply a

definition of safe speed that required the [vessel] to consider the effect of its vessel on other vessels in the vicinity."). Although Master Jimbo presented evidence that the *Bow Fortune* could have proceeded slower in the channel, it did not show that moving at full ahead minutes before the collision was unsafe under the circumstances. The court finds that the *Bow Fortune* did not violate Rules 6 and 19.

Master Jimbo then argues that Schuessler violated Rule 7 because he did not perceive a collision risk when the *Pappy's Pride* was on the outer edge of the foggy, narrow channel and did not further reduce the *Bow Fortune*'s speed to avoid the risk. Again, Rule 7 requires vessels to use all appropriate means to determine if a collision risk exists. *See* 33 C.F.R. § 83.07(a). The court does not find that the *Bow Fortune* violated Rule 7. Once the *Pappy's Pride*'s movements became concerning, Schuessler reduced speed, initiated three VHF-radio calls, sounded two danger signals, and altered the *Bow Fortune*'s course 20 degrees starboard. Simultaneously, Schuessler balanced other prevailing circumstances, such as the vessels behind him and the crosscurrents, when deciding how to respond to the *Pappy's Pride*'s unexpected movements. The court finds that the *Bow Fortune* complied with Rule 7.

For the same reason, the court finds that the *Bow Fortune* did not violate Rule 8. As explained above, Rule 8 requires vessels to act "in ample time and with due regard to the observance of good seamanship." *Id.* § 83.08(a). Any course alteration or speed change should be "large enough to be readily apparent to another vessel observing visually or by radar; a succession of small alterations of course and/or speed should be avoided." *Id.* § 83.08(b). Master Jimbo alleges that the *Bow Fortune*'s speed reduction was too slight to make a difference and that she should have changed direction. But, as stated above, the court finds that Schuessler's speed changes reasonably balanced a host of concerns he was facing simultaneously. Moreover, the *Bow Fortune did* change direction—she turned to starboard to try to avoid the *Pappy's Pride*. If the *Pappy's Pride* had not then made a sudden turn to port, this collision would very likely have never occurred. The *Bow Fortune* did not violate Rule 8.

The court concludes that the *Bow Fortune* did not violate any Inland Navigation Rules and did not breach any duty she owed the *Pappy's Pride*. Nothing the *Bow Fortune* did or did not do legally caused the collision. Therefore, the *Bow Fortune* was not negligent and is entitled to limitation under 46 U.S.C. § 30505.

## V.    Apportionment of Fault

The *Pappy's Pride*'s unseaworthiness and the acts and omissions of Master Jimbo and its employees proximately caused the collision. The court concludes that the *Bow Fortune* petitioners bear no fault or responsibility for the collision.

Because the court has found only one party at fault, it is unnecessary to apportion fault between the *Pappy's Pride* and *Bow Fortune*.

\*    \*    \*

In sum, the court finds and concludes that the *Bow Fortune* petitioners proved by a preponderance of the evidence that the *Pappy's Pride* was negligent and unseaworthy, and that her negligence and unseaworthiness were the sole legal cause of her collision with the *Bow Fortune*. The *Pappy's Pride* violated Inland Navigation Rules 5, 7, 8, 9, 19, and 35, violated U.S. Coast Guard requirements for radio usage, and failed to train her crew on these rules. The court also finds and concludes that Master Jimbo had privity of the *Pappy's Pride*'s negligence and unseaworthiness and, therefore, is not entitled to limited liability under 46 U.S.C. § 30505.

Meanwhile, Master Jimbo failed to prove by a preponderance of the evidence that the *Bow Fortune* violated any Inland Navigation Rules or was otherwise negligent or unseaworthy, let alone that any negligent conduct by

the *Bow Fortune* legally caused the collision. Accordingly, the court grants

the *Bow Fortune* petitioners' petition for exoneration from liability.

IT IS SO ORDERED.

Signed on Galveston Island this 24th day of January, 2023.

_____

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE